*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0183P (6th Cir.)
File Name: 02a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

CHARLES L. LORRAINE,
        *Petitioner-Appellee,*

        *v.*

RALPH COYLE, Warden,
        *Respondent-Appellant.*

No. 01-3464

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 96-00801—David D. Dowd, Jr., District Judge.

Argued: May 2, 2002

Decided and Filed: May 23, 2002

Before: NORRIS, SUHRHEINRICH, and GILMAN,
Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Michael L. Collyer, OFFICE OF THE
ATTORNEY GENERAL, CAPITAL CRIMES SECTION,
Cleveland, Ohio, for Appellant. Luigia Tenuta, Dublin, Ohio,
for Appellee. **ON BRIEF:** Michael L. Collyer, OFFICE OF
THE ATTORNEY GENERAL, CAPITAL CRIMES
SECTION, Cleveland, Ohio, for Appellant. Luigia Tenuta,

Dublin, Ohio, Marc S. Triplett, Bellefontaine, Ohio, for Appellee.

_____

## OPINION

_____

SUHRHEINRICH, Circuit Judge. Finding the petitioner's claims of prosecutorial misconduct and ineffective assistance of counsel meritorious, the district court conditionally granted a writ of habeas corpus to Petitioner Charles L. Lorraine. Respondent Ralph Coyle appeals. For the reasons set forth below, we **REVERSE.**

### I. Background

### A. Facts

On the evening of May 6, 1986, Petitioner went to the home of Doris and Raymond Montgomery, age 80 and 77, respectively. The Montgomerys had in the past hired Petitioner to do jobs around the house. Petitioner lured Raymond upstairs. Petitioner stabbed Raymond five times in the back with a butcher's knife. Petitioner went back downstairs and stabbed Doris, who was bed-ridden, nine times. He then burglarized the home.

Petitioner proceeded to a bar and bought drinks with the stolen money. Petitioner bragged about killing two "old people." He and a friend left the bar. They broke into a house and stole $40 and a car. They then went back to the Montgomerys' house and stole money, jewelry, and a gun. Afterwards, Petitioner and his friend went to Denny's for breakfast.

Petitioner confessed to the killings on videotape.

the Supreme Court, on direct appeal of a federal conviction, ruled that the prosecutor's misconduct was so pronounced and persistent that the probable prejudicial effect upon the jury was highly probable, given the weak case against the defendant. It therefore held that a new trial was warranted. The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it cannot be said that the judgment of the Ohio courts is contrary to *Berger,* or to any other Supreme Court decision so as to warrant relief under the AEDPA. *Cf. Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983) (pre-AEDPA case; holding that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair"). Once again, the district court overstepped its bounds on habeas review.

### IV.

For all of the foregoing reasons, the district court's grant of the writ of habeas corpus is **REVERSED** and the case **REMANDED** with instructions to dismiss the petition.

court's statement to the jury that its sentence was only a recommendation. The Ohio Supreme Court ruled that "[w]e have held many times that such comments are within constitutional limits. *E.g. State v. Durr*, . . . 568 N.E.2d 674, 682-83 [(Ohio 1991)]."

Although the district court did not refer to it, presumably the court was concerned that the prosecutor's statements violated *Caldwell v. Mississippi*, 472 U.S. 320 (1985), which held that the trial court must not mislead the jury "in a way that allows [it] to feel less responsible than it should for the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). However, we have upheld such comments as an accurate statement of Ohio law, *see Scott v. Mitchell*, 209 F.3d 854, 877 (6th Cir. 2000) (holding that trial judge's statement to the jury that its recommendation of death would be "just that--a recommendation," while a recommendation of life imprisonment was binding, is an accurate statement of the law), *cert. denied*, 531 U.S. 1021 (2000); *Mapes*, 171 F.3d at 414-15 (same).

Finally, assuming that more than one of the above claims had merit, the district court failed to demonstrate how the cumulative "errors" had a "substantial and injurious effect" on the jury's verdict. *Brecht*, *supra*. In short, in finding that prosecutorial misconduct warranted the granting of the writ, the district court exceeded its proper role on habeas.

### C.  Cumulative Error

In addition to holding that Petitioner's ineffective of counsel at the mitigation phase and prosecutorial misconduct "*each*" entitled Petitioner to the grant of his writ, the district court also ruled that the cumulative weight of the two combined warranted the same relief. In support, the district court cited *Berger*, *supra*.

To begin, this claim was not raised in the state courts or in the district court. It is therefore both procedurally defaulted and waived. Further, *Berger* does not hold that cumulative constitutional errors merits habeas relief. Rather, in *Berger*,

### B.  Procedural History

Petitioner was indicted under Ohio Rev. Code §§ 2903.01(A) and (B) for the aggravated murders of the Montgomerys. Each of those counts carried a capital specification that the murder was committed in the course of an aggravated burglary (felony-murder specification) and was in the course of killing two or more people (mass-murder specification). Petitioner was also charged with two counts of aggravated burglary in violation of Ohio Rev. Code § 2911.11, one for the burglary of the Montgomery home and one for a different home.

Petitioner's jury trial began on November 4, 1986.[1] On November 19, 1986, he was found guilty of all counts and specifications. On December 1, 1986, the penalty phase began. Petitioner presented ten lay witnesses, a forensic psychologist, and his unsworn statement. The State called four rebuttal witnesses. On December 4, 1986, the jury recommended two death sentences, one for the aggravated murder of each of the victims. On December 9, 1986, the trial court adopted the jury's death sentence recommendation. The court also sentenced Petitioner to ten to twenty-five year terms of incarceration on his aggravated burglary convictions.

Petitioner raised twenty-eight assignments of error on direct appeal to the Ohio Court of Appeals.[2] On August 13, 1990, the Ohio Court of Appeals affirmed Petitioner's conviction and sentence. *See State v. Lorraine*, No. 3838, 1990 WL 116921 (Ohio Ct. App. Aug. 13, 1990). Petitioner appealed to the Ohio Supreme Court, raising twenty-two assignments of error. On June 16, 1993, the Ohio Supreme Court affirmed the conviction and sentence. *See State v. Lorraine*, 613

---

[1] Three attorneys from the Ohio Public Defender Commission were appointed to represent Petitioner at trial: Ken Murray, Michael Gleespen, and Scott Kenney.

[2] Petitioner was represented by Randall M. Dana, Michael Gleespen, and Richard Vickers on direct appeal.

N.E.2d 212 (Ohio 1993). The United States Supreme Court denied certiorari. *See Lorraine v. Ohio*, 510 U.S. 1054 (1994).

On September 14, 1994, Petitioner filed a post-conviction petition pursuant to Ohio Rev. Code § 2953.21, raising twenty-nine claims for post-conviction relief and requesting an evidentiary hearing. On January 5, 1995, the trial court denied the petition without a hearing. On February 23, 1996, the Ohio Court of Appeals affirmed the trial court's judgment. *See State v. Lorraine*, No. 95-T-5196, 1996 WL 207676 (Ohio Ct. App. Feb. 23, 1996). Petitioner appealed to the Ohio Supreme Court. On September 18, 1996, the Ohio Supreme Court declined jurisdiction over Petitioner's case and dismissed the appeal as not involving a substantial constitutional question. *State v. Lorraine*, 669 N.E.2d 856 (Ohio Sept. 18, 1996) (table).

On April 10, 1996, Petitioner filed with the trial court a Rule 60(B) motion for relief from its judgment denying post-conviction relief. The trial court denied the motion. Petitioner appealed from this order, raising five assignments of error. The Ohio Court of Appeals reversed on the sole ground that the trial court did not have jurisdiction to decide the Rule 60(B) motion because, at the time of its decision, Petitioner's appeal to the Ohio Supreme Court was pending. *See State v. Lorraine*, No. 96-T-5494, 1997 WL 799551, at *3 (Ohio Ct. App. Dec. 12, 1997).

On April 10, 1998, the trial court granted the Rule 60(B) motion and ordered the post-conviction petition reactivated. On May 3, 1999, the trial court denied the reactivated petition. On September 5, 2000, the Ohio Court of Appeals affirmed the trial court's ruling. On January 24, 2001, the Ohio Supreme Court declined jurisdiction due to a lack of any substantial constitutional question.

On April 24, 1997, Petitioner filed this habeas petition. On March 30, 2001, the district court conditionally granted the writ of habeas corpus on two grounds. First, the court determined that Petitioner had been deprived of effective

Although the prosecutor, on numerous occasions, asked the jury not to give the appellant the reduced sentence of life imprisonment, at no point did the prosecutor tell the jury that there existed a presumption in favor of the death penalty. Parties are given wide latitude in making closing arguments.

*State v. Lorraine*, No. 3838, 1990 WL 116921, at *19 (Ohio Ct. App. August 10, 1990). The Ohio Court of Appeals also noted that the trial court correctly instructed the jury on the burden of proof and sentencing alternatives. *Id.*[18] Other than claiming "cumulative effect," the district court did not identify how the state decision is an unreasonable application of federal law, or conclude that the statements had a substantial and injurious effect on the jury causing actual prejudice. *See Brecht*, *supra*.

### c. Suggestion that Sentence was Recommendation

The district court was further "disturbed" by the prosecutor's repeated suggestion to the jury that its verdict was only a recommendation.[19] This issue appears to not have been raised below and is therefore procedurally defaulted. However, Petitioner did challenge on direct appeal the trial

---

[18]The Ohio Court of Appeals decision does not indicate whether the jury was instructed as to the difference between recommending the death penalty and imposing a life sentence.

[19]The prosecutor stated:
(1) "That is what you are charged with doing; making the recommendation [of death]." (MP at 1014); (2) ". . . a Jury would never make a recommendation in this County that could lead to the execution of a Defendant unless the State provided its case. . ." (MP at 1084); (3) "Nobody is asking you to put this Defendant in the electric chair yourself. It's not--the State of Ohio, we are requesting the death penalty. It's the law." (MP at 1092); and, (4) "There is a big difference between penalties. One is a recommendation of death. The other is a recommendation of life with possible parole." (MP at 1094). Opinion Granting Writ at 94 n.77.

constitutional due process right to a fair trial, especially since the court instructed that the remark was improper and should be disregarded).

Again, the district court did not demonstrate how these remarks violated federal law. In large part, most are permissible appeals to community sentiment. The district court also did not show how the Ohio Supreme Court's harmless error ruling violated federal law. Given the overwhelming evidence of guilt, we do not find that the Ohio Supreme Court's harmless error ruling to be faulty under the more stringent standard in *Brecht*.

### b. Reduced Sentence Comment

The district court was also troubled by several references by the prosecutor to a life sentence as a "reduced sentence." The district court noted:

> Second, there were constant references to any life sentence as a "reduced" sentence: (1) ". . . They are asking you to reduce his penalty. They are asking you to reduce the sentence, and I submit never under the evidence of this case because you can't get better evidence, of guilt, of responsibility in what this Defendant did . . . " (MP at 1092); (2) ". . . I would hate to think that he would get a reduction from this Jury that he does not deserve . . ." (MP at 1101); (3) " . . . if you feel that he deserves a reduced sentence of life at that time, then I want you to think about . . . [the] two separate deaths here. . . " (MP at 1103); and (4) "I want you think about that woman, and I want you to ask yourselves, can you give him a second reduced sentence." (MP at 1104).

Opinion Granting Writ at 94 n.77.

The Ohio Supreme Court did not address the issue. The Ohio Court of Appeals, on direct appeal, found that:

---

assistance of counsel at the mitigation phase due to counsel's failure to investigate, develop, and present available factors relevant to mitigation under Ohio Rev. Code § 2929.04(B).[3] More specifically, the district court faulted defense counsel for failing to develop evidence to establish that Petitioner has a mental disease or defect which significantly affected his ability to appreciate the crime, a mitigating factor under § 2929.04(B)(3). *See* Ohio Rev. Code § 2929.04(B)(3). The court further held that prosecutorial misconduct infected the trial. It therefore ordered that Respondent release Petitioner, unless the Court of Common Pleas of Trumbull County, Ohio

---

[3]Ohio Revised Code § 2929.04(B):

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age . . . the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

(1) Whether the victim of the offense induced or facilitated it;

(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Ohio Rev. Code Ann. § 2929.04(B) (Anderson 1999).

At issue in this appeal is mitigating factor (B)(3).

resentenced him within 120 days of the accompanying judgment.

Respondent appeals.

## II.  Standards of Review

### A.  Merits

Our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Under the AEDPA, a federal court may not grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits unless (1) the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1) (1994 & Supp. VII), or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Id.* § 2254(d)(2).

A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  An "unreasonable application" occurs when "the state court identified the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  Under this standard, a state court decision is not unreasonable simply because the federal court concludes that the state decision is erroneous or incorrect. *Id.* at 411.  Rather, the federal court must determine that the state court decision is an objectively unreasonable application of federal law. *Id.* at 410-12.  Factual findings by state courts are presumed correct.  28 U.S.C. § 2254(e)(1).

#### a.  Appeal to Community Sentiment

The prosecutor made appeals to community sentiment in both voir dire and closing argument.  He made the following four statements:

> (1) "Unlike Mr. Murray [out-of town defense counsel], I have to live in this community with you . . ." (MP at 1082); (2) "It's not easy to be where you are at, but what you are doing is just as important as what the soldiers did in our World Wars and in Viet Nam.  You are setting the standard of justice in Trumbull County." (MP at 1083); (3) ". . . I agree with Defense counsel that you will live with that in the future.  You will live with that not only for yourselves but for your parents, for your children and for your grandchildren. . . (MP at 1094); and (4) "[I] ask you only to . . . do your duty as a collective group representing a community. . . . " (MP at 1101).

Opinion Granting Writ at 94 n.77.

The Ohio Supreme Court noted that "[a] request that the jury maintain community standards is not equivalent to the exhortation that the jury succumb to public demand." *State v. Lorraine*, 613 N.E.2d at 218.  The court held that "[t]he evidence in the case was "so overwhelming that none of the prosecutor's comments, even if error, amounted to prejudicial error."  *Id.*  The court further noted that instances of prosecutorial misconduct can be harmless when incidental and isolated.  *Id.*

*Berger v. United States*, 295 U.S. 78 (1935), sets the standard of conduct imposed on  federal prosecutors.  The prosecutor's primary interest in a criminal prosecution is that "justice shall be done."  Thus, "while he may strike hard blows, he is not at liberty to strike foul ones." *Id.* at 88-89.  A prosecutor may not make statements designed to arouse the passions or prejudice of the jury.  *Viereck v. United States*, 318 U.S. 236, 247-48 (1943).  *See also Donnelly*, 416 U.S. 637 (prosecutor's remarks in closing argument, in the context of the entire trial, did not violate the defendant's

2002);  *see also Penry v. Johnson*, 532 U.S. 782, 795 2001) (applying *Brecht* analysis to challenge to penalty phase).[17]

We conclude that the prosecutor's statement was basically "a fair response to Petitioner's unsworn statement." *See Byrd*, 209 F.3d at 535 (holding that the prosecutor's remark that the petitioner's comments were "shallow" because the petitioner did not accept more complete responsibility for his actions and for the victim's death, but merely stated that he was "sorry for what happened," and "sorry for [the victim] and his family" was not a reference to the petitioner's failure to present sworn testimony and to acknowledge his guilt as the principal offender but rather a fair comment on the evidence). *Cf. Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (holding that prosecutor's comment during sentencing that the defendant had the opportunity to hear other witnesses and testify was not impermissible under *Griffin*, but merely a comment concerning the petitioner's credibility as a witness).

In any event, our independent review reveals that the isolated remark, in light of the extensive mitigating evidence before the jury, did not result in actual prejudice. In short, the district court erred in granting the writ on the basis of the prosecutor's reference to the Petitioner's unsworn statement.

### 3. Other Acts

The district court also expressed its "disapproval" of several other prosecutorial acts, which in the court's view, "if not constitutionally infirm in their own right, together raise the specter of the 'cumulative effect' of prosecutorial misconduct about which the Supreme Court warned in *Berger. v United States*, 295 U.S. 78, 89 (1934)." *See* Opinion Granting Writ at 94 n.77. We consider these additional acts below.

---

[17] The Ohio Supreme Court did not refer to the federal Constitution or the federal harmless error doctrine, nor any case applying a constitutional analysis.

We review the district court's grant of a writ of habeas corpus de novo. *Sandford v. Yukins*, No. 00-2504, – F.3d – , 2002 WL 499884, at *3 (6th Cir. April 4, 2002); *Northrop v. Trippett*, 265 F.3d 372, 376 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1358 (2002). We review the district court's legal conclusions de novo, and its factual findings for clear error. *Greer v. Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1323 (2002).

### B.  Procedural Default

If a habeas petitioner fails to raise an issue in state court, the claim is procedurally defaulted and may not be considered by the federal court on habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Seymour v. Walker*, 224 F.3d 542, 549-550 (6th Cir. 2000), *cert. denied*, 532 U.S. 489 (2001). A petitioner may avoid procedural default however, if he demonstrates cause and prejudice for the default, or that a miscarriage of justice will result from enforcing the procedural default in his case. *Sykes*, 433 U.S. at 87, 90-91; *Seymour*, 224 F.3d at 550.

### III.  Analysis

### A.  Ineffective Assistance

Respondent challenges the district court's ruling that trial counsel were ineffective in the mitigation/penalty phase for various reasons. Before turning to Respondent's challenge to the merits, however, we must first address Respondent's contention that Petitioner defaulted this particular ineffectiveness claim because he never presented it to the state courts, and because the ineffective assistance claims he did raise lacked evidentiary support, all in violation of Ohio's established procedural rules.

### 1.  Failure to Raise in State Courts

Petitioner did not raise any ineffective assistance of trial counsel claims on direct appeal. He raised the following three ineffective assistance of trial counsel claims on

postconviction in the trial court: First, he claimed that trial counsel were deficient "by failing to acquire experts who could have established the effect upon the Petitioner of the combination, content, and amount of alcohol and drug use by him on the night of the homicides." He added that "[t]he use of a pharmacologist could have proven the effect of the combination of drugs and alcohol used by the Petitioner upon his ability to control his actions and form a specific intent." Second, Petitioner argued that "his trial attorneys failed to proceed with a defense of not guilty by reason of insanity notwithstanding the existence of psychological evidence in support of this plea." Third, he claimed that counsel were ineffective for assorted reasons, including (a) permitting petitioner to make an unsworn statement to the jury during sentencing and failing to prepare him to make that statement effective or meaningful; (b) making statements during mitigation indicating their lack of experience and familiarity with death penalty proceedings; (c) failing to bring an improper out-of-court contact with a juror to the attention of the court and failing to move for a mistrial based upon juror bias and predisposition; (d) waiving the right to be present and to have petitioner present during the in-chambers voir dire of a juror who was excused from further service during the trial based upon perceived inebriation during the proceedings; (e) failing to interview and prepare for witness testimony during the mitigation phase of the trial; (f) failing to persist in objecting to the prosecutor's improper closing argument during mitigation following admonishment by the trial court; (g) failing to make proper objections during both the guilt and mitigation phases of the trial; and (h) failing to communicate to the judge that lead counsel had effectively abandoned inexperienced junior counsel during the trial.

On appeal of the trial court's denial of his § 2953.21 petition, Petitioner alleged that the trial court erred in denying his request for an evidentiary hearing on the claims as raised by his postconviction petition. *See State v. Lorraine*, 1996 WL 207676, at *1. The Ohio Court of Appeals ruled that Petitioner's ineffective assistance of trial counsel claims

these limits by referring not only to credibility but also to appellant's silence on particular issues and to the lack of cross-examination. However, this misconduct was harmless beyond a reasonable doubt.

*State v. Lorraine*, 613 N.E.2d at 218.

The district court found the foregoing portion of the prosecutor's rebuttal closing argument "particularly troubling in light of a defendant's constitutional right to remain silent." Opinion Granting Writ, at 92. It concluded that "[t]he jury was left with the implication that it could take into consideration the fact that Lorraine never testified and given the jury his side of the story, except for an unsworn statement." *Id.* at 93.

Again, the district court did not discuss the Ohio Supreme Court decision or cite any United States Supreme Court precedent on the issue of the Fifth Amendment. *See Griffin v. California*, 380 U.S. 609 (1965) (holding that a prosecutor's direct reference to a criminal defendant's failure to testify is a violation of the defendant's Fifth Amendment privilege against compelled self-incrimination). *See also Byrd*, 209 F.3d at 533 (noting that indirect references on the failure to testify can also violate the Fifth Amendment privilege). The district court also did not discuss the federal harmless error doctrine found in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), namely that reversal is warranted only when a trial error "had a substantial and injurious effect or influence in determining the jury's verdict."

Rather than conducting a de novo review, the district court should have made an independent determination of whether the alleged error here--an indirect reference on Petitioner's failure to present sworn testimony--resulted in actual prejudice per *Brecht. See Calvert v. Wilson*, -- F.3d -- No. 00-3713, 2002 WL 662662 at *-- (6th Cir. April 24, 2002); *Ford v. Curtis,* 277 F.3d 806, 809 (6th Cir. 2002); *Zobel v. Tate*, No. 00-3989, 2002 WL 220637, at *5 (6th Cir. Feb. 11,

### 2. Comment on Petitioner's Unsworn Statement

The district court also criticized the prosecutor's comment on Petitioner's unsworn statement to the jury. During opening statements of the penalty phase, Petitioner, standing at counsel table and not having been sworn, stated to the jury: "I would like to say I'm sorry, and I wish it never happened." In his closing argument during the penalty phase, the prosecutor referred to the unsworn nature of Petitioner's statement and questioned why Petitioner did not comment about his mitigation:

[PROSECUTOR]: . . . Our 23 witnesses testified under oath. They had 10 witnesses that testified under oath, and do you think it's important as to the effect of his wife's pregnancy, the unemployment, his problems with his upbringing, isn't it important for you to know what he had to say about that–

[DEFENDANT]: Objection, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]: Subject to cross examination?

THE COURT: Overruled.

[PROSECUTOR]: No. What was his statement to this Jury? Did he get up on this witness stand like those other witnesses? He says I'm sorry I wish it didn't happen. . . .

The Ohio Supreme Court ruled on this issue as follows:

This court has previously considered this issue in *State v. DePew*, . . . 528 N.E.2d 542, 554 [(Ohio 1988)], wherein we stated that "the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath in contrast to the testimony of all other witnesses." The prosecutor's comment went beyond

were barred because they could have been raised on direct appeal. *See id.* at *2-3.

In the case *sub judice*, the first claim made by appellant relates to ineffective assistance of trial counsel. Appellant asserts that his trial counsel were also his appellate counsel and that they made numerous errors in his representation depriving him of a fair trial. However, a review of the court record reveals that appellant had three attorneys from the public defender's office to represent him at trial, and four attorneys from the public defender's office represent him on appeal. Thus, appellant's three different appellate attorneys could have raised the ineffectiveness of his trial counsel on direct appeal.

*Id.* at *2. The appeals court therefore held that *res judicata* applied because Petitioner had new counsel on appeal. *Id.* (citing *State v. Cole*, 443 N.E.2d 169 (Ohio 1982)).

In his federal habeas petition, Petitioner raised seven categories of claims, including ineffective assistance of counsel and ineffective mitigation/expert assistance.[4]

---

[4] As the district court noted, the individual allegations supporting the claim of ineffective assistance of counsel at mitigation are as follows:

Fourth Claim for Relief
*Ineffective Assistance of Counsel*

185. ... Petitioner sets out his allegations that he was deprived effective assistance of counsel and this [sic] denied due process of law, as as [sic] guaranteed by the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

. . .

195. Faced with surprise, undisclosed or unanticipated rebuttal witnesses for the State during mitigation, trial counsel stood on objections to form or process and failed utterly to attempt impeachment, explanation or distinction upon cross-examination. As a result, the jury heard testimony undermining mitigation which was challenged only by "overruled" technical objections and not by any attempt at meaningful examination.

. . .

196. There was no effective challenge to the last witness heard by the jury, the "summary witness," Dr. Bertschinger who opined without challenge on the criminality/mitigation of personality disorders of a man he did not personally examine. . . .

197. Trial counsel failed to object to the prosecutor's unlawful "let the Defendant testify" outburst, uttered during mitigation. . . .

198. Trial counsel failed to explore mental disease and/or insanity and/or legal competency in defense. . . .

199. Trial counsel failed to object to the State's characterization of a life sentence as a "reduced sentence." . . .

200. Trial counsel failed to object to the State's argument inferring, improperly, future dangerousness, by calling the Petitioner a "psychopath" in closing argument. . . .

201. Trial counsel's objection to the trial court's penalty phase jury instructions were read, as if by formula, into the record after the jury retired to consider and ultimately (in two hours) determine Mr. Lorraine's death sentence. . . .

204. As a consequence of this ineffective defense, which was compounded and exploited by abusive prosecution, Mr. Lorraine's death sentence is unlawful.

. . .

### Fifth Claim for Relief
*Ineffective Expert/Mitigation Assistance*

208. . . . Petitioner sets out his allegations that he was deprived effective expert assistance and/or mitigation evidence, unlawfully depriving him of factors to present to a jury in favor of his life. Mr. Lorraine was therefore denied due process, a fair trial and effective assistance, all as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution.

209. Trial counsel stated, in the middle of the mitigation/penalty case and before the jury, that defense did not prepare its expert for nor request an investigation of Petitioner's sanity or legal competence. . . . Coupled with a failed plan for mitigation (elsewhere described as ineffective assistance of counsel), neither Petitioner's claim nor Petitioner himself was evaluated for the mental disease or defect which offers mitigation in favor of life under § 2929.04(B)(3) of the Revised Code of Ohio.

210. In short, Petitioner's capacity to understand the criminality of his conduct (any conduct) or his capacity to

application of, or contrary to, Supreme Court precedent.[16] Instead, the district court conducted its own de novo review.

The district further failed to afford a presumption of correctness to the state court's findings of fact, as required by 28 U.S.C. § 2254(e)(1). The state court found no evidence of bad faith or withholding of evidence and therefore no violation of Ohio Criminal Rule 16, which requires the state to turn over the evidence if it reasonably anticipates calling the witness. *See State v. Lorraine*, 613 N.E.2d at 220. The district court disagreed, and found as a matter of fact that the prosecutor "would have definitely known that it would be calling the doctor as a rebuttal witness." Opinion Granting Writ, at 78 n.67. The district court based this ruling on the fact that the defense had filed numerous pretrial motions regarding psychological assistance and testing, which, in the district court's view, should have put the prosecutor on notice that the defense would offer evidence on Ohio Rev. Code § 2929.04(B)(3) (lack of substantial capacity based on a mental disease or defect). However, in this regard, the district court overlooked § 2929.04(B)(7), the catchall factor. Defense counsel was entitled to and, in fact, did offer Dr. Jackson's testimony under this mitigating factor as well. *See, e.g., State v. Richey*, 595 N.E.2d 915, 930-31 (Ohio 1992) (holding that while anti-social personality behavior does not constitute a (B)(3) factor, it may be considered under (B)(7) or as part of the defendant's background). Under these circumstances, the district court did not have clear and convincing evidence to rebut the presumption of correctness afforded the state court's fact finding. In sum, the state's failure to provide the name of its rebuttal witness is not a proper basis for granting habeas relief.

---

[16] In fact, the district court does not mention the decision at all. The district court made reference to the Ohio Court of Appeals' decision on direct appeal. The district court noted that, although the appellate court found that the trial court did not abuse its discretion, at the same time that court criticized the State's behavior. Opinion Granting Writ at 78-79.

accused); *Giglio v. United States*, 405 U.S. 150 (1985) (finding due process violation where prosecution failed to disclose that it had promised a coconspirator that he would not be prosecuted if he testified against the defendant); *United States v. Agurs*, 427 U.S. 97, 107 (1976) (finding due process violation where prosecution withholds evidence clearly supportive of a claim of innocence); *Bagley*, 473 U.S. 683 (holding that the prosecution's failure to disclose before trial that federal agents had contracted to pay the witnesses for information and testimony against the defendant was constitutional error only if there was a reasonable probability that the results of the proceeding would have been different had the information been disclosed); s*ee also Seymour*, 224 F.3d at 552 (holding that "[i]n light of the wide latitude afforded to states with regard to evidentiary matters under the Due Process Clause, this court cannot say, under the relevant Supreme Court precedent, that Seymour's due process rights were violated by the state's introduction of the testimony of those rebuttal witnesses"). *Cf. Campbell*, 260 F.3d at 559 (noting that even if the state withheld information showing that two informants received deals with the state as compensation for their favorable testimony, which would be a violation of *Brady*, habeas corpus may only be granted if, given disclosure, the result of the proceeding would have been different). The Ohio Supreme Court's ruling was therefore not contrary to, or an unreasonable application of, federal law.[15]

The district court's ruling also represents a fundamental misunderstanding of its proper role under the AEDPA. Under the AEDPA, the district court is not allowed to grant the writ unless it finds that the relevant state court decision is contrary to, or an unreasonable application of, Supreme Court precedent. The district court ignored the relevant state court decision, that of the Ohio Supreme Court, and therefore did not explain how that decision was an unreasonable

---

[15]In any event, the Ohio Supreme Court's decision rests on an adequate an independent state ground.

conform his conduct to norms, mores and the law were wholly unexamined factors.

211. A comparison of the direct examination, by defense counsel, and cross-examination, by the State, of Petitioner's mitigation expert, Dr. Jackson, finds that the defense used by the clinical forensic psychologist to convey a "social history" and the State examined the witness for medical and clinical evaluations which the witness had *not* been engaged to perform. . . .

212. As a consequence, the jury heard threads of information, during mitigation, about an abused, emotionally and intellectually underdeveloped nineteen year old, with a significant drug and alcohol history. Petitioner was portrayed as a man of substantially below average intelligence (in intelligence quotient which lowered 10 points from grade school to adolescence) who had fathered, as a teenager, a severely handicapped child. Significant and repeated experience with law enforcement for juvenile misconduct, Petitioner's family had followed a pattern of conduct which Petitioner eventually learned and acted upon. Testimony described abused siblings and a father who chased a mother with a butcher knife.

213. Despite these factors, no plan to evaluate legal competency was advanced by defense counsel. As a result, an experienced psychologist testified only about what he was engaged to do--evaluate a social history and determine the existence of a severe personality disorder or profound emotional disturbance. . . .

214. The poorly prepared defense ill-summarized mitigating factors. The direct examination left the examiner to testify, on cross-examination, about issues he did not evaluate, mental disease or (in)competency. The defense expert, on cross-examination, was used by the state to hypothesize on conclusions on issues he was not employed to prepare. The result of this ill-conceived, ill-developed, under-investigated strategy by the defense was a demeaning wisecrack made by the State prosecutor on re-cross examination of the expert: "so . . . [Petitioner] would probably be best described as an unsuccessful psychopath, right?" . . .

215. Worse, the State had concealed its plan to use a "summary witness" on rebuttal. Psychiatrist Dr. Bertschinger was long prepared to opine (from the record and not from examination of Petitioner) about any deficiency or absence in defense evaluation. Defense expert Dr. Jackson testified and prepared his examination without the expectation that the issues he failed to evaluate and/or draw conclusions from would serve

The district court ruled that Petitioner's ineffectiveness claims were not procedurally defaulted in the state courts because on direct appeal Petitioner's trial counsel continued to represent him with the addition of new counsel, creating a potential conflict of interest as to raising ineffective assistance of trial counsel claims, a situation that was not addressed in *State v. Cole*, *supra*.  *See* Opinion Dated May 30, 2000 at 9-12; Opinion Granting Writ at 50-51.

Although Ohio courts generally require defendants to raise ineffective assistance of trial counsel claims on direct appeal, *see Greer,* 264 F.3d at 674 (quoting *State v. Cole*, 443 N.E.2d 169 (Ohio 1982) (syllabus)),  as the district court ruled, the default is not necessarily fatal here because one of Petitioner's trial counsel remained on the direct appeal team.  *See Combs v. Coyle*, 205 F.3d 269, 276-77 (6th Cir.) (holding that the petitioner's ineffective assistance of trial counsel claims, which were first presented in state postconviction proceeding, were not procedurally defaulted on state res judicata grounds because petitioner's trial counsel continued to represent him with the addition of new counsel, and the potential conflict of interest was not addressed by state procedural rules in effect

as the last impression heard by the jury before its [sic] considered Mr. Lorraine's death sentence.

216.  Upon information and belief, this Petitioner suffers significant mental defect and/or disease, appreciably low intelligence and significant behavioral and emotional disorders, rendering him incapable of understanding the significance of any conduct, the nature and impact of the circumstances he faces, and thus, the ability to conform his conduct to law, norms or mores.

217.  Deprived effective assistance at the mitigation/penalty phase of his trial, Petitioner was also deprived a life sentence, violating his rights to due process, equal protection, a fair trial, effective representation and his rights against excessive or cruel and unusual punishment, all in contravention of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendment[s] to the United States Constitution.

Opinion Granting Writ at 45-48.

Federal Rules of Criminal Procedure compelled pre-trial disclosure of any impeachment evidence related to the defendant's case.  *Presser*, 844 F.2d at 1284. *Cf. United States v. Logan*, Nos. 97-5912, 97-5914, 1999 WL 551353 (6th Cir. July 19, 1999) (holding that the district court did not err in refusing to deny defendant's motion to bar testimony from government rebuttal witness or continue the trial because defendant was not entitled, under pre-1997 version of Fed. R. Crim. P. 16 or the Constitution, to discovery of a rebuttal witness).  In short, there is no constitutional violation cognizable on habeas here.

Further, to the extent that a constitutional claim can be stated under the *Brady* doctrine, the district court failed to establish that the Ohio Supreme Court's decision was an unreasonable application of *Brady* and progeny.  In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the Due Process Clause requires the government to turn over evidence in its possession that is *both* favorable to the accused and material to guilt or punishment.  In *Bagley*, cited by the district court, the Supreme Court emphasized that

> [t]he *Brady* rule is based on the requirement of due process.  Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.  Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*United States v. Bagley*, 473 U.S. 667, 675 (1985) (footnotes omitted).

Petitioner's case does not fall  within the rule of *Brady* and *Bagley*, because the information Petitioner sought was not "favorable to the accused."  *Cf. Napue v. Illinois*, 360 U.S. 264 (1959) (holding that due process is violated when the government attains a conviction through perjured testimony); *Brady,* 373 U.S. 83 (due process violation where prosecution withholds a confession of guilt by someone other than the

The prosecution came prepared to refute any evidence to that effect; but the defense was not given the same opportunity. . . .

Although the state courts criticized the prosecutor's actions, they consistently dismissed them as essentially harmless and non-prejudicial to the petitioner because the trial court had granted a continuance and because the evidence of guilty was overwhelming. This Court cannot agree. The one-day continuance offered (begrudgingly, and actually only because Dr. Bertschinger could not come back to testify until the next day) was in no way sufficient to cure the prosecution's failure to disclose this witness. How could defense counsel possibly do anything substantive at that late date to remedy the prejudicial position it had been placed in by this failure to disclose? In addition, even accepting a conclusion that evidence of *guilt* was overwhelming, that has no bearing on the question of whether there existed factors sufficient to mitigate any aggravating circumstances so as to foreclose a death penalty. This was "trial by ambush" and it infected the mitigation phase of the trial.

(Opinion Granting Writ at 91-92).

The district court's ruling is faulty on several fronts. First, assuming that the prosecutor did violate Ohio Crim. R. 16, such a claim is not cognizable on habeas, because it is not a constitutional violation. *See generally* 28 U.S.C. § 2254(a) (providing that habeas corpus proceedings are available only for claims that a person "is in custody in violation of the Constitution or laws or treaties of the United States"). As we explained in *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988), the Supreme Court has consistently held that "'[t]here is no general constitutional right to discovery in a criminal case[.]'" *Id.* at 1281 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). Rather, all the Constitution requires, per the due process clause, is that the defendant not be deprived of a fundamentally fair trial. *Id.* Thus, in *Presser*, this court concluded that neither the Constitution nor the

---

at the time), *cert. denied*, 531 U.S. 1035 (2000).[5] Thus, as in *Combs*, we are not barred from reviewing the merits because no firmly established procedural rule mandated that Petitioner's ineffective assistance of trial counsel claims had to be raised on direct appeal under these circumstances. *See id.* at 277.[6]

Nonetheless, Petitioner's ineffective assistance counsel claims raised on federal habeas rest on different theories than those raised in the state postconviction proceedings, and are therefore procedurally defaulted anyway. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (holding that a claim was procedurally defaulted because it "rest[ed] on a theory which is separate and distinct from the one previously considered and rejected in the state court"); *Lott v. Coyle*, 261 F.3d 594, 607, 619 (6th Cir. 2001) (holding that "relatedness" of issue did not save claim; citing *Wong*), *cert. denied*, 122 S. Ct. 1106 (2002). Petitioner's closest state claim is that trial counsel failed to use a pharmacologist in the guilt phase to establish an insanity defense, which is an entirely different theory than the failure to develop evidence of organic brain damage and head injuries as mitigation.

On the other hand, as Petitioner points out, Respondent did not present this particular default argument--that Petitioner failed to present his ineffective assistance of trial counsel at mitigation--in direct response to Petitioner's habeas petition.[7]

---

[5] Petitioner's direct appeal to the Ohio Court of Appeals, like that in *Combs*, preceded *State v. Zuern*, Nos. C-900481, C-910229, 1991 WL 256497 (Ohio Ct. App. Dec. 1, 1991) (holding that "new counsel" as referenced in *Cole* includes new co-counsel).

[6] The district court ruled that Petitioner's ineffective assistance of trial counsel claims were not procedurally defaulted in an opinion dated March 30, 2000.

[7] Respondent's Return of the Writ argues merely that "Lorraine has waived his underlying claims of ineffective assistance of trial counsel. Instead of presenting his 'ineffective assistance of trial counsel for failures apparent on the record' claim on direct appeal pursuant to state

Respondent did, however, raise this theory of default in its response to a motion filed by Petitioner to expand the record with information going to the question of mental defect which was or would have been available to trial counsel. *See Respondent's Memorandum in Opposition to Lorraine's Proposed Expansion of the Record with Sealed Documents Pertaining to his Claim of a Mental Defect,* pp. 2-6.[8] Petitioner therefore had an opportunity to respond. *Cf. Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998) (holding that district court did not abuse its discretion in raising procedural default problem *sua sponte* because the petitioner had an opportunity to respond; proceeding involving a § 2254 motion). Furthermore, this Court has held in a § 2255 context that it may *sua sponte* raise procedural default despite the Government's failure to defend on that ground. *See Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000); *see also Morse v. Trippett*, No. 00-1868, 2002 WL 257207, at *9 n.4 (6th Cir. Feb. 20, 2002) (applying *Elzy* in § 2254 context); *Smith v. Johnson,* 216 F.3d 521, 523-24 (5th Cir. 2000) (raising procedural default in a § 2254 case *sua sponte* at the appellate level).

---

law, Lorraine raised it for the first time in state postconviction, . . . where it was properly dismissed due to *res judicata.*" Respondent Coyle's Return of the Writ at 73.

[8]Respondent's Memorandum in Opposition to Lorraine's Proposed Expansion of the Record with Sealed Documents Pertaining to His Claim of a Mental Defect states in pertinent part:

Lorraine argued in his fifth claim for relief in the habeas action that, based on "information and belief," his trial counsel were ineffective in failing to investigate and present evidence in the penalty phase that Lorraine "suffers significant mental defect (sic) and/or disease, appreciably low intelligence and significant behavioral and emotional disorders." *Petition for Writ of Habeas Corpus,* p.62, ¶216. *Lorraine did not raise this claim in his state post-conviction proceedings, the only appropriate place to litigate such a claim.*

(Emphasis added.)

permitted to testify, but he was not cross-examined until after a one-day continuance that was granted at appellant' request. . . . We can find no prejudice to the appellant. Accordingly, this proposition is not well-taken.

*State v. Lorraine*, 613 N.E.2d at 220.

The district court found to the contrary. Noting that it was required to "examine whether, in light of the record as a whole, the prosecution's misconduct was 'of sufficient significance to result in the denial of a defendant's right to a fair trial,'" (Opinion Granting Writ at 79; quoting *United States v. Bagley*, 473 U.S. 667 (1985)), the court proceeded to examine "in considerable detail" the testimony of Drs. Jackson and Bertschinger at the penalty phase. (*Id.*) The court concluded:

Since the primary issue at this phase of the trial was whether or not petitioner could establish mitigating factors which might be used to outweigh any aggravating circumstances so as to avoid the death penalty, it is disingenuous for the state to argue, both then and now, that it had no idea whether it would need to call Dr. Bertschinger and, therefore, had no duty to disclose his identity as a witness.

When the cross-examination of Dr. Jackson is studied, it is quite clear that the prosecution was using Dr. Jackson to *set up* information which it planned to *shoot down* by way of Dr. Bertschinger's testimony. Dr. Bertschinger was clearly pre-armed with his own information and findings designed specifically to discredit testimony which any self-respecting prosecuting attorney would have anticipated, given the nature of the defendant's various pre-trial motions. It had to have been obvious to the prosecution that the defense strategy would have involved trying to establish that petitioner had been unable to appreciate the nature of his actions or conform his conduct to the requirements of the law.

names of witnesses it reasonably anticipates calling.[14]  The court stated:

> The criterion for determining whether the state should have provided the name of a witness called for rebuttal is whether the state reasonably should have anticipated that it was likely to call the witness, whether during its case in chief or in rebuttal.  *State v. Howard,* . . . 383 N.E.2d 912, 915 [(1978)].  The prosecutor stated that he did not know he would use any of the witnesses until appellant's witnesses testified on direct.  We hold that the prosecutor did not have a duty to provide the names of witnesses that he reasonably did not anticipate would testify until testimony was presented by appellant which was then properly rebutted.

> Crim. R. 16(E)(3) gives the trial court discretion to determine a remedy for noncompliance with the discovery rule.  The issue is whether the court abused its discretion.

> After a thorough review of the record it is clear that the trial court did not abuse its discretion in permitting the witness[] to testify.   The witness[] called by the prosecution properly rebutted appellant's evidence.  Moreover, there was no evidence of bad faith or willful withholding of this evidence.   Dr. Bertschinger was

---

[14]Ohio Crim. R. 16(B)(1)(e) provides in relevant part:
. . . Upon motion of the defendant, the court shall order the prosecuting attorney to furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial, together with any record of prior felony convictions of such witness, which record is within the knowledge of the prosecuting attorney.
*State v. Lorraine*, No. 3838, 1990 WL 116921, at *4 (Ohio Ct. App. Aug. 10, 1990) (quoting the rule).   The Ohio Court of Appeals characterized the state's failure to provide the defense with the names of the potential rebuttal witnesses as "a poor practice which is greatly disapproved by this court." *Id.*  It assumed that the state violated the rule, but found that the trial court did not abuse its discretion in imposing a sanction, namely a continuance. *Id.* at *5.

---

## 2. Failure to Attach Documentation

Respondent raises a second procedural default argument.  He claims that Petitioner failed to attach documentation in support of his state postconviction ineffective assistance claims.  Petitioner attached the affidavits of trial attorneys Ken Murray and Michael Gleespen to the postconviction petition, but the affidavits do not mention the pharmacologist claim (which was raised) or the deficiencies concerning the penalty phase (which were not raised).  Petitioner has thus defaulted those claims otherwise properly preserved by failing to present the necessary proof in the state postconviction review.  *See Byrd v. Collins*, 209 F.3d 486, 512 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001); *Mapes v. Coyle*, 171 F.3d 408, 421-22 (6th Cir. 1999).  This procedural rule has been routinely and regularly applied in the Ohio courts. *See, e.g., State v. Calhoun*, 714 N.E.2d 905, 910 (Ohio 1999); *State v. Jackson*, 413 N.E.2d 819, 823 (Ohio 1983).  *See generally Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (setting forth four factor test to determine if a claim is procedurally defaulted); *Greer*, 264 F.3d at 672-73 (discussing *Maupin*).  However, the state court of appeals in this case (the last explained state court judgment addressing this issue) did not rely on this procedural ground in denying Petitioner relief.  Thus, we are not barred from reviewing this issue due to procedural default.  And again, Respondent did not raise this defense in his Return of the Writ, although he did raise it in a separate district court proceeding.  *See Respondent's Brief Regarding AEDPA's Effect on Lorraine's Expansion of the Record, Discovery and Evidentiary Hearing Requests*, p. 7.

In short, Petitioner's various claims of ineffective assistance of trial counsel in mitigation, as articulated in his federal habeas petition, are arguably procedurally defaulted.   It would therefore not be improper for us to decline review of these claims, since the state courts did not have the opportunity to address them.  *See Buell*, 274 F.3d at 349 (noting that a petitioner's failure to raise his claims in Ohio courts is an adequate and independent state law ground for

denying the writ). Furthermore, Petitioner has not shown actual prejudice or a fundamental carriage of justice will result if we enforce the procedural default doctrine. *See Seymour*, 224 F.3d at 550. Notwithstanding, given the somewhat oblique manner in which Respondent raised the defense, we opt to address the merits.

### 3. Merits

The district court concluded that counsel "were seriously and objectively ineffective in their planning and carrying out of the mitigation/sentencing phase of the trial." Opinion Granting Writ at 62-63. Respondent claims that the district court misapplied the *Strickland* test in reaching the conclusion that Petitioner received constitutionally ineffective assistance.

To show that counsel were constitutionally ineffective, a defendant must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and also that counsel's deficiencies prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first requirement, the defendant must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Regarding the second, the defendant must demonstrate that there exists a reasonable probability that, absent counsel's professional errors, the results of the proceeding would have been different. *Id.* at 694. The Supreme Court has cautioned that scrutiny of defense counsel's performance must be "highly deferential." *Id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

To evaluate this claim, it is best to begin with the evidence Petitioner actually presented in mitigation, namely ten lay witnesses, one forensic psychologist, and his unsworn statement in mitigation. His father, Clarence D. Lorraine, described Petitioner's hyperactive behavior when a young child, his early use of alcohol and drugs, and his fathering of

court's rulings pertaining to prosecutorial misconduct. We deal with each in turn.

### 1. Failure to Disclose Rebuttal Witness

The district court held that the prosecutor's failure to disclose the identity of its rebuttal witness, Dr. Bertschinger, rose to the level of a constitutional violation rendering the mitigation phase of the trial fundamentally unfair.

Petitioner presented Dr. Jackson, a forensic psychologist, at the penalty phase, as his last witness. After recross examination, the prosecutor asked Dr. Jackson for the records the defense had provided him, stating that he had a psychiatrist who wanted to review them. At this point defense counsel requested a sidebar with the judge. Defense objected on the basis of Ohio Criminal Rule 16, claiming that the prosecutor had not provided Bertschinger's name, despite pretrial written requests. The next day, Wednesday, December 3, 1986, the State called Dr. Bertschinger as its final rebuttal witness. At the end of the prosecutor's direct examination, the defense approached the bench to reiterate its objection. Defense counsel also asked for a one-day continuance. When asked by the court why he had not provided defense counsel with Bertschinger's name, the prosecutor responded that he "didn't decide this physician would be a witness until their doctor testified." Further, the prosecutor indicated that the defense had waited until the day before Dr. Jackson's testimony to turn over Jackson's report. The prosecutor stated that his expert would disagree with Dr. Jackson's opinion on the (B)(3) mitigator and that Dr. Bertschinger "wouldn't have been a witness but for the doctor's answer." After consulting with the doctor regarding his schedule, the court agreed to have the doctor return the next day at 2:30 p.m., essentially granting a one-day continuance.

On direct appeal, the Ohio Supreme Court determined that the prosecutor did not violate Ohio Criminal Rule 16 (B)(1)(e), which requires the prosecution to disclose the

the medical records in *Seidel* explicitly noted the defendant's mental afflictions. *See Seidel*, 146 F.3d at 755-56. At most, Campbell's childhood medical records would have provided another list of people to interview. These former physicians and healthcare workers, Campbell argues, would have been able to expose his mental condition.

This is much too tenuous a claim to support the conclusion that Campbell was prejudiced by his attorneys' failure to look into his childhood medical records.

*Id.* at 555. *See also Martin v. Mitchell*, 280 F.3d 594, 613-15 (6th Cir. 2002) (holding that counsel were not ineffective in failing to investigate or prepare for mitigation; although investigation was not exhaustive, counsel presented some mitigating information at sentencing; and the petitioner did not establish prejudice because he failed to point to what mitigating evidence further action by his counsel would have uncovered). Here, Petitioner's claim is even more tenuous than that in *Combs*, because trial counsel in this case actually pursued a lead regarding Petitioner's organic brain damage. They cannot be deemed ineffective, since even at this late date, there is no medical *proof* of such a condition.

In sum, the record shows that counsel's efforts to investigate, develop, and present mitigating evidence were constitutionally effective, and that there was no prejudice, because counsel not only attempted to humanize Petitioner before the jury, it also did not deprive the jury of available mitigating evidence. The district court's conclusion that counsel was ineffective is therefore an unreasonable application of *Strickland*.

### B. Prosecutorial Misconduct

To grant habeas relief based on prosecutorial conduct that does not violate a specific guarantee under the Bill of Rights, the misconduct must be so egregious as to deny the petitioner due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). Respondent challenges several of the district

a child. He told the jury that Petitioner loved his child, who had developed spinal meningitis and was institutionalized as a result. Clarence also told the jury that Petitioner, while still a child, had witnessed his aunt's murder and that "it shook him up pretty good."

Petitioner's brother, Steven J. Lorraine, testified that Petitioner started using drugs and alcohol when he was thirteen or fourteen years old. Steven stated that Petitioner was calm and kind when he was not high. He told the jury that Petitioner was doing drugs on the day of the crime, that "he wasn't in his right mind[,]" and that "[h]e's always trying to help people and he really didn't mean what he did." Brother Richard Lorraine, attested to the violent and chaotic family life that he and Petitioner and his other siblings experienced. Richard testified that both he and his sister Kathy had attempted suicide while teenagers due to the abuse in the home. He told the jury about Petitioner's drug use, and the burglaries he committed to get bingo money for their mother.

Anita Carroll, Lorraine's aunt, described how Petitioner would clean the house when his mother went to bingo, and how Petitioner's mother would take him to buy "wacky weed." Carroll also stated that she never heard either of Petitioner's parents express any love toward their children. Catherine Lovash, Petitioner's grandmother, told the jury that she loved Petitioner and stated that "I don't think he should get the electric chair. He should get life because you know, he needed help or something, really; I think so."

Phyllis Gregory, a neighbor and friend of the Lorraine family, described the living conditions in the Lorraine home as "chaotic." Gregory also testified that Petitioner used drugs on the day of the murders. Jule Brown, the children's director at the Lorraines' church, told the jury that the Lorraine parents sent the children to church because they thought it was a good babysitting service, and did not attend church themselves. She described the Lorraine children as "the most unusual children I have ever seen. They had no discipline at all. . . .

I think that they were taught to take whatever they could get any way they could get it."

A teacher, Delores Jeffries, testified that she taught Petitioner in a sixth-grade math class for kids with learning disabilities. She testified that Petitioner was always "level" with her. John Evanovich, another sixth grade teacher, testified that Petitioner was stealing from him as early as the third grade. He stated that Petitioner had a "poor sense of what was right and wrong or a poor sense of truth." Doug Dennis, another special education teacher, testified that although he felt that Petitioner knew that there was appropriate behavior, "he didn't seem to understand or care that someone was getting upset or irritated."

Dr. Jackson, a clinical forensic psychologist, was Petitioner's final mitigation witness. As the district court noted, Dr. Jackson reviewed "school and medical records, work history, reports of treatment for mental conditions and history of legal problems, as well as interviews with petitioner's neighbors, friends, relatives and teachers. Dr. Jackson also conducted his own individual examination of the petitioner and administered psychological testing, including tests for intelligence, personality and efficiency of brain functioning." Opinion Granting Writ at 80.

The district court recounted his testimony:

At trial, Dr. Jackson reviewed the petitioner's personal history for the jury in considerable detail. He noted that petitioner's family is quite dysfunctional from early on. The father was "passive or uninvolved" with respect to the children's development and the mother was "overwhelmed and unable to really provide them with the kind of discipline and constructive life that young children very much need." (MP at 802).

During first grade, petitioner was identified as emotionally mentally retarded, with an IQ of 83, suggesting borderline mental functioning. (MP at 804). At that time there were already incidents which showed

classified as mentally retarded, and organic brain damage, specifically global brain damage sustained before he was born, despite its availability).

In contrast with the foregoing cases, Petitioner's trial counsel not only conducted ample investigation into Petitioner's background, but developed the mitigating information and actually presented it to the jury. Largely through the detailed narrative of Dr. Jackson, trial counsel presented a comprehensive picture of Petitioner's chaotic and abusive childhood, and how this family pattern led to the defects in his personality development. Dr. Jackson also discussed his borderline IQ, his school record, his prison record, and his own tragic fatherhood. In short, Dr. Jackson's "considerabl[y] detail[ed]" testimony of Petitioner's personal history, *see* Opinion Granting Writ at 80, combined with the corroborative testimony of friends and relatives, put a "human face" on Petitioner before the jury. *See Coleman*, 268 F.3d at 253 (mitigating evidence would have "humanized" the petitioner before the jury, quoting *Carter*); *Carter*, 218 F.3d at 592. As discussed, the record further reflects that trial counsel investigated potential brain dysfunction, but found none.

Rather, this case is much like *Combs v. Coyle*, 260 F.3d 531 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1448 (2002). There the petitioner claimed ineffective assistance of counsel at sentencing based on counsel's alleged failure to discover that he suffered from post traumatic stress disorder ("PTSD"). This Court rejected his claim because the petitioner failed to point to anything in the record showing that he suffered from PTSD or any other psychological disorder.

The *Combs* court stated:

We also note that, unlike in *Seidel* [*v. Merkle*, 146 F.3d 750, 752 (9th Cir. 1998)] and *Glenn* [*v. Tate*, 71 F.3d 1204 (6th Cir. 1995)]. . . , Campbell has not pointed to anything in his childhood medical records indicating that he has either PTSD or some form of brain damage. He has never been diagnosed or treated for PTSD, whereas

revealed that the petitioner's childhood was extremely poor, violent, and unstable; medical records showed both childhood and adult head injuries from accidents and fights, and shortly before trial, a prison physician recommended that the petitioner be considered for psychiatric hospitalization due to his nerves and paranoid behavior; as well as positive relationships with his step-children, family, and friends; and concluding that the foregoing "constituted deficiencies so severe as to dispense with the need to establish prejudice"); *Combs,* 205 F.3d at 287-88 (finding that trial counsel's failure to question his only expert witness about his opinion regarding whether the petitioner possessed the requisite intent to commit the crimes before putting him on the stand during the guilt phase was objectively unreasonable where the expert's testimony that the petitioner did not lack the requisite intent due to intoxication "contradicted the sole defense theory" and "was completely devastating to the defense"); *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997) (holding that trial counsel's portrayal of his own client as "vicious and abnormal" during the guilt and penalty phases was not a legitimate trial strategy, depriving his client of effective assistance of counsel, and presuming prejudice); *Groseclose v. Bell*, 130 F.3d 1161, 1169-71 (6th Cir. 1997) (finding ineffective assistance in trial counsel's failure to have "any defense theory whatsoever," and its failure during sentencing to present mitigating factors such as the petitioner's lack of any criminal history, active role in his church, positive military and numerous family members willing to testify on his behalf); *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (recognizing that the failure to present mitigating evidence when it was available could not be deemed a strategic decision, but instead an "abdication of responsibility"; finding ineffective assistance at sentencing due to counsel's failure to present any mitigating evidence when several of the petitioner's relatives, friends, death penalty experts and a minister were available and willing to testify on his behalf); *Glenn v. Tate*, 71 F.3d 1204, 1207-11 (6th Cir. 1995) (finding trial counsel ineffective at mitigation due to their failure to develop and present evidence regarding the petitioner's background, including the fact that in school he had been

extreme "socially deviant behavior . . . [which] was not something that was a one-time occurrence of a mischievous child." (*Id*.). In third grade, petitioner was placed in a learning disability class and referred to a doctor for evaluation regarding his hyperactivity and possible attention deficit disorder. (MP at 805). Records state that one of his teachers thought he was exhibiting "a poor ability to differentiate between right and wrong." (*Id*.). By the end of his third grade year, when petitioner was age nine, a school psychologist noted that he had "deteriorated in his behavior, that he was more resistant to receiving help, and he was exhibiting more anti-authoritative attitudes." (MP at 808).

At the age of ten, he was given permission by his mother to smoke because his mother felt she could not stop him and she did not want him burning down the house when smoking in secret. Dr. Jackson opined that this showed petitioner's parents' inability "to provide proper control and guidance." (*Id*.)

When the petitioner was in fifth grade and approaching 12 years old, both an older brother and an older sister attempted suicide. (MP at 809). At the end of that school year, he went to another new school and "first began to commit antisocial acts in the form of theft on a regular basis." (MP at 810). In March of 1980, his IQ tested at 73, which Dr. Jackson believed more accurately represented petitioner's "true intellectual ability." (*Id*.).

By the age of 13, enjoying little supervision from his parents and suffering under a father who abused alcohol and prescription medication upon which he had grown reliant, petitioner was "exhibiting clearly symptoms of a conduct disorder[.]" (MP at 811). In June of 1981, petitioner began to appear in the records of the Department of Youth Services. He was delinquent, committed theft and curfew violations, and engaged in disorderly conduct and criminal trespass. On one occasion, he took his mother's car and drove around with

his brother in it; when his brother fell out the door and broke his leg, petitioner did not even stop to help. (MP at 813).

In September 1981, petitioner was put in a group home where he received home instruction. The staff notes indicate that he was an "agitator" who "liked to stir things up," and that he sought negative attention which accelerated in severity over time. (MP at 814).

When petitioner was 16 years old, he met Rhonda, a 14-year old girl who would eventually become his wife. Within a few months, she was pregnant because Rhonda's mother permitted them to engage in sex in her home. (MP at 816). In April 1983, he was arrested for breaking and entering, a crime committed with Rhonda's mother. (*Id.*). He was sent to Cuyahoga Hills Boys School where he stayed until August 1983. He returned to the ninth grade but was expelled in December because "his behavior exhibited a danger to the other students and to the faculty." (MP at 817). Around this time, a neighbor began to involve the petitioner and other children in B&Es [breaking & entering], providing them with drugs and alcohol. Petitioner also began to abuse hallucinogens like acid and cocaine. (*Id.*).

In November 1983, petitioner's son was born. The baby developed spinal meningitis and was rendered blind in both eyes and suffered brain damage. In 1984, petitioner stopped attending school. In February of that year, he was charged with two counts of assault, unauthorized use of a motor vehicle and criminal trespass, all of which were dismissed when he pled true to two counts of theft. (MP at 818).

In February 1985, petitioner and Rhonda married. They lived at first with her mother and then with one Al Richards, a disabled man whose mother paid the rent and who involved petitioner in more B&Es. The couple got their own apartment in June 1985, but after one day there, petitioner was arrested and jailed for three weeks

they failed to investigate and introduce evidence of the petitioner's nightmarish childhood, including severe and repeated beatings by his father, and available evidence showing that the petitioner was borderline mentally retarded; also finding prejudice in that the evidence "might well have influenced the jury's appraisal of his moral culpability"); *Coleman v. Mitchell*, 268 F.3d 417, 449-53 (6th Cir. 2001) (finding ineffective assistance for failure to investigate and present mitigating evidence concerning the petitioner's horrific childhood at the hands of his grandmother, his primary caretaker, who abused him physically and psychologically while running her home as a brothel and gambling house, and who involved him in her voodoo practice and group sex practices; and failure to present available proof of his borderline mentally retarded I.Q. score, as well as school reports, psychological reports, hospital records, prison records, and previous psychiatric and psychological evaluations, which revealed that at the time of trial the petitioner had a borderline personality disorder; and finding prejudice because it was "reasonably probable that the presentation of even a substantial subset of the mitigating evidence" would have "humanized" the petitioner), *cert. denied*, -- S. Ct. --, 2002 WL 524537 (U.S. April 24, 2002) (No. 01-9463); *Cone v. Bell*, 243 F.3d 961, 977-79 (6th Cir. 2001) (holding that trial attorney was ineffective where he presented no mitigating evidence at all and made no final argument and did not even ask the jury to spare the defendant's life), *cert. granted*, 122 S. Ct. 663 (2001); *Skaggs v. Parker*, 235 F.3d 261, 266-75 (6th Cir. 2000) (finding counsel constitutionally ineffective at the penalty phase for failing to investigate and present mitigating evidence, and for deciding to use an incompetent and fraudulent "psychologist" as the central mitigation witness, despite his bizarre and often incoherent performance at the guilt phase as well as his failure to discuss mitigating evidence including borderline mental retardation and diminished mental capacity), *cert. denied*, 122 S. Ct. 322 (2001); *Carter v. Bell*, 218 F.3d 581, 594-600 (6th Cir. 2000) (concluding that trial counsel's failure to investigate and present mitigating evidence fell below objective standard of reasonableness where the record

standard of reasonableness under *Strickland* simply because the leads led to nowhere.[13]

Nor did the district court find prejudice. Rather, it merely had "grave doubt" whether counsel's alleged deficiencies could have led to mitigation: "it is speculation where those leads might have taken them." Opinion Granting Writ at 63. This is not the *Strickland* test. Indeed, habeas counsel did not find evidence of organic brain damage, despite the opportunity. On May 30, 2000, the district court allowed the record to be expanded by accepting an *in camera* proposal for expansion of the record to include information going to the question of mental defect which was or would have been available to trial counsel. After that proposal was made, the court granted further expansion of the record. Opinion Granting Writ at 53. And Petitioner's own habeas psychological expert failed to report organic brain damage. Dr. Thomas Paulucci, a psychologist, faulted Dr. Jackson's testing procedures, but ultimately concluded that it was "impossible" to determine Petitioner's psychological or neuropsychological status in 1986, his sanity, or whether his conduct was influenced by symptoms of psychopathology or substance abuse. In other words, if habeas counsel could not find evidence of organic brain damage, then trial counsel cannot be deemed ineffective here. Nor can there be any prejudice.

A comparison with other cases holding that ineffective assistance of counsel at mitigation warranted issuance of the writ reveals that trial counsel's conduct in this case in no way fell below an objective standard of reasonableness resulting in prejudice. *Cf. Terry Williams v. Taylor*, 529 U.S. 362, 395-98 (2000) (finding ineffective assistance of counsel because

---

[13]The district court also highlighted the relative inexperience of two of the three trial counsel, and partly attributed "their failure to develop facts sufficient to raise reasonable doubt in the jurors' minds about the appropriateness of a death sentence" to that inexperience. *See* Opinion Granting Writ at 60-61. Whether inexperienced or not, we do not find deficient performance or prejudice under *Strickland.*

on two counts of aggravated burglary and two counts of strong-armed robbery. Rhonda moved in with petitioner's parents. After petitioner got out of jail, the records show a "chaotic relationship" with Rhonda, including physical violence between them. (MP at 818-19). . . . Petitioner continued to abuse drugs, injecting cocaine. He basically lived "to get high and party." (MP at 821).

In March 1986, petitioner was sentenced to 3 to 15 years in prison for purse snatching.[] The sentence was delayed because Rhonda was pregnant again and due in May. (MP at 821). The Montgomery homicides occurred in May of 1986.

Dr. Jackson characterized petitioner's school history as follows:

> a repeated pattern of failure to meet the expectations of his teachers and the inability to learn and profit from experience and the inability to form genuine friendships, the terrible effects of drugs and alcohol at a very early age which prevents the child from learning how to cope in a meaningful way with the challenges that life brings. All of these, I think, contributed to arresting his development, to stopping the growth that he would need later to be considered able to handle affairs as a responsible person.

(MP at 822). Dr. Jackson said petitioner was born "with a defect" which caused him not to identify with others and "stop[ped] him] from acting on [his] impulses and in [his] own behalf." (MP at 823). He characterized petitioner as "a leader because he will agitate" but also as a "stimulation seeker[]" who "looks for excitement." (MP at 824).

Dr. Jackson testified that petitioner was "pressure oriented" and "has little or no way of identifying with others;" that "his internal controls involving a conscience are virtually nill [sic];" that "he acts . . . to avoid

punishment and seek pleasure;" and that "he can be charming and pleasant, but at the same time . . . shallow and self-directed." (MP at 825-26). In summary, Dr. Jackson stated that, although petitioner was reading at about fourth grade level, emotionally he functioned only at the level of a pre-schooler, somewhere around the age of 4 or 5 at most. (*Id.*). Dr. Jackson stated that petitioner "has a mask of socialization" but actually never developed beyond the very early years and has not reached the stage of development where he acts so as to avoid disappointing someone he loves. (MP at 826-27).

Ultimately, Dr. Jackson concluded as follows:

Charles Lorraine suffers a defect in personality development which includes features of an anti-social personality disorder; additionally, that his history indicates abuse of alcohol and illicit drugs, and that additionally, the information gathered indicates that he has some features of an anxiety disorder within his personality and also some defects in his mental functioning regarding memory and recall. As a result of all of these conditions, it appears to me that [petitioner] at the time of the murders which he committed, was suffering these defects and that they contributed substantially to the offenses that occurred.

(MP at 796-97). He characterized petitioner's disorder as severe, stating:

This is not something he picked up later in life as an easy way out of responsibility. This is built into him from the earliest records we have, that he may be able to tell you particularly whether something is right or wrong, but that does not control his behavior.

(MP at 832). "[E]ven though he, technically, knows right from wrong, [] his ability to actually choose the right

The district court faulted trial counsel for failing to perform these tests in a "timely" fashion. But the court overlooked the fact that Petitioner refused to take the MRI and CT tests on October 18 and 20, 1986, as originally scheduled by trial counsel. Trial counsel cannot be faulted for their client's lack of cooperation. *See Byrd*, 209 F.3d at 527 (declining to hold that defense counsel's performance at the mitigation phase was constitutionally ineffective for failing to employ a psychologist or psychiatrist when the petitioner refused to be interviewed by either).

The district court also criticized defense counsel for not conducting a more timely drug screen. However, as the pharmacologist in this case observed, any screen was going to be of limited value because the crimes were committed days before Petitioner was caught. Furthermore, counsel pursued the lead with Dr. Jackson, who testified about the significance of such drug abuse. Counsel also called numerous lay witnesses, who attested to Petitioner's drug abuse, both in the past and on the day of the murders.

In light of the foregoing, we simply cannot agree with the district court's conclusion that "counsel was utterly and objectively ineffective during the mitigation phase of trial," and that they "simply did not pursue leads with respect to mitigation." Opinion Granting Writ at 62, 63. The foregoing recitation clearly reveals that trial counsel investigated and presented to the jury a comprehensive depiction of Petitioner by exploring his family history, school records, prison record, and medical history. The Mitigation Team also pursued various leads as to potential organic brain damage, *but found no evidence of mental disease or defect*. It simply cannot be said that trial counsel's conduct fell below an objective

---

CAT Scan and MRI, but unfortunately did not find anything of significance. Because Chuck's crime is so heinous, I am afraid we have an uphill battle on our psycho-social explanation of Chuck and his family.

EEG did contain a mild degree of diffuse non-specific slowing of background electrical frequencies, which is a non-specific finding of uncertain clinical significance. It can be seen with excessive drowsiness, metabolic and toxic dysfunctions and degenerative proccesses, [sic] among others. They are non-specific but do suggest underlying organic neurologic dysfunction. However, this finding cannot be construed as explaining violent or deviant behavior.

The Mitigation Team arranged for a CAT scan to be taken at Trumbull Memorial Hospital on November 4, 1986. Dr. Mah, who interpreted the test results, found no significant abnormalities. The Mitigation Team also had an MRI done the same day at Mt. Sinai in Cleveland. Dr. Wiener, who interpreted the test results, found a "[n]ormal MRI of the head." Dr. DeMaria also evaluated these test results. On November 18, 1986, he reported to Jane Core that Petitioner's "CT and MRI of the brain were both normal, indicating the absence of any significant underlying and structural brain disease to explain his behavior. Thus, aside from the minor nonspecific changes noted on the EEG, . . . Mr. Lorraine appears to be completely normal from a neurological standpoint. I, therefore, can find no neurologic reason to explain violent behavior. One other way to evaluate Mr. Lorraine for such a line between underlying organic neurologic disorder and violent behavior would be through the use of psychological testing."[12]

---

[12]Respondent indicates that although there are no reports from Dr. Tanley, a neuropsychologist, in the record, it is clear that he was consulted. For example, the record includes correspondence from the Ohio Public Defender's Office to Dr. Tanley, which reflects that family and life history information were sent to Dr. Tanley before his evaluation of Petitioner. Also included is a letter referencing the bill Dr. Tanley sent to the Ohio Public Defender's Office for his evaluation of Petitioner. In that letter Jane Core thanked Dr. Tanley for his assistance, and updated Tanley on the case.

Chuck was found guilty (as expected) of all charges on Wednesday (19th). Our mitigation hearing will begin on December 1st. Dr. DeMaria evaluated Chuck, including EEG,

---

without external support or barriers is very limited." (*Id*). [70]

---

[70] In his report of November 28, 1986, Dr. Jackson had concluded:

Charles' history indicates family patterns in which externalization of anger towards others was prominent. Charles has been described as reacting in a very negative way when he was thwarted, criticized, or punished. Prior to the killings, he was facing prison time, a marital dispute had led to his being evicted from his home and told not to come back by his pregnant wife, his blind and brain-damaged son had taken a turn for the worse, and others whom he viewed as at least as culpable as her were not being sent to prison. Charles' anger is likely to have been strong and seeking an outlet.

It is clearly extremely important to consider the effect of the illicit drug abuse in which Charles had engaged prior to the killings. Charles' history indicates that he stole from older people who were less likely to take retaliatory action against him. However, he did not exhibit a pattern of vicious or sadistic assault in his antisocial behaviors. At the time of the killing of the older couple in this case, however, Charles was by his own and others' description, extremely intoxicated by both alcohol and drugs. The combined influence of these intoxicants upon a person whose aggressive drives were not inhibited by ordinary bonds of socialization caused Charles' judgement to fail even more massively than it repeatedly had in the past.

There remain unanswered questions about additional circumstances which may have led Charles to kill two elderly people who had befriended him. It is my opinion, however, that from his early childhood Charles has exhibited a combination of defective internalization of concepts of right and wrong as well as inadequate and harmful family socialization patterns. His emotional instability, poor coping skills, lack of behavioral and self control, and limited intellectual ability contributed to a survival level of functioning which was masked by a glib and seemingly slick exterior. The fatal outcome of adding excessive intoxication by alcohol and illicit substances to this existing background, in my opinion, created the circumstances in which these tragic killings took place.

(Doc. No. 81, Attachment at 6).

---

When asked about mitigating factors, Dr. Jackson said one must consider early presence of some kind of impairment in brain functioning leading to difficulties in reading and being placed in special education classes; lack of development of normal socialization patterns; no

family support or guidance; early use of drugs and alcohol; lack of self-respect; and early marriage. (MP 839-40).

Opinion Granting Writ at 80-85.

On cross-examination, Dr. Jackson admitted that he had not seen the results of the EEG or CT scans, but had been told that the tests found no evidence of organic brain disease or dysfunction. Also on cross, Dr. Jackson conceded that Petitioner has no mental disease, but that he has "a personality disorder [that is] enduring, a repetitive pattern of maladapted behavior that is very resistant to change." Finally, Dr. Jackson gave his opinion whether Petitioner qualified under the third mitigating factor of "mental disease or defect" under Ohio Rev. Code § 2929.04(B)(3):

Well, I think that he does in one way and he doesn't in another. It depends on how you define the words used in number 3. Number 3 say whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. I believe that this man suffers from a personality defect. I believe that that defect substantially impairs his ability to conform his conduct to the requirements of the law. There is no question in my mind about that. . . . It's a personality defect, and since personality is part of your mental functioning, it could be considered a mental defect. If you did not consider, by defining it that way– if you limited that definition to mental defect having to do with retardation, he would not qualify.

The prosecution offered several rebuttal witnesses, including (over Petitioner's objection), Dr. Kurt Bertschinger, a psychiatrist. Dr. Bertschinger agreed with Dr. Jackson's diagnosis of antisocial personality disorder, but found no evidence of mental disease or illness. Dr. Bertschinger acknowledged on cross-examination that an antisocial personality disorder can be debilitating.

*brain dysfunction should be pursued through neurological and medical assessment techniques.*

(Emphasis added.)[11]

*And counsel followed this lead.* As the record shows, the Team consulted a neurologist, Dr. DeMaria. Dr. DeMaria administered an EEG on Petitioner on October 20, 1986, wrote two follow-up reports on October 21 and 22, and evaluated the results of a CAT scan and an MRI on November 17 and 18. In his October 21, 1986 report, Dr. DeMaria opined that

I can find no clinical evidence of neurologic dysfunction in this man's history or physical exam. He may have suffered some vascular-muscular contraction headaches in the past, but that hardly accounts for his behavioral problems. He may, indeed, have a mild learning disability, but he does not appear to be retarded. He seems to be competent for his own actions.

I obviously can't exclude the possibility of an underlying organic dysfunction as the cause of the patient's behavior problem, but on this evaluation I could certainly find no supporting evidence for such dysfunction.

Dr. DeMaria also noted that Petitioner refused at that time to have a CAT scan. On October 22, 1986, Dr. DeMaria reported that Petitioner's

_____

[11]The district court points out that Dr. Jackson removed the suggestion of neurological testing from the second report. That testing had already been performed by the date of the second report.

The district court further found that the November 29, 1986 report prevented trial counsel from using any of the information in it during voir dire or during the guilt phase of the trial. The district court overlooked the fact that counsel had the initial report by October 19, 1986. Ironically, as the district court itself noted, the October 19 report is more comprehensive than the November 29 report. *See* Opinion Granting Writ at 56 n.49. In any event, the district court did not explain how Petitioner was prejudiced.

more records and witness interviews on October 11, 1986. Also on October 11, 1986, Dr. Jackson administered psychological tests to Petitioner for over two hours. On October 12, 1986, Dr. Jackson interviewed Petitioner for two hours and spent another two hours reviewing and integrating the case history and information. On October 13, 1986, Dr. Jackson scored the psychological testing and sent copies of it to Dr. Tanley, a neuropsychologist in Columbus, as instructed by the Mitigation Team. On October 19, 1986, Dr. Jackson prepared his preliminary summary of findings for the Mitigation Team.

The Mitigation Team also administered psychological tests to five of Petitioner's family members, and Dr. Jackson scored them. The Mitigation Team consulted a pharmacologist, who evaluated the results of a drug screen that was performed on Petitioner several days after the crimes. Dr. Sanberg issued his report on October 21, 1986. In short, the district court's decision is at odds with the facts in the record.

The district court also faulted counsel for failing to develop evidence of organic brain damage. The court based its ruling on Dr. Jackson's conclusion that "'[t]he overall pattern of [Petitioner's] test scores suggests that some degree of organic brain dysfunction is present . . . .'" Opinion Granting Writ at 58 (quoting Dr. Jackson's November 29, 1986 report).

The district court correctly found that Dr. Jackson suggested the possibility of organic brain damage. Indeed, Dr. Jackson testified that he suggested to the Mitigation Team that such testing be performed on Petitioner. Dr. Jackson's recommendation can also be found in his October 19, 1986 report to the Mitigation Team, where he not only suggested possible brain damage, but also suggested medical testing.

The overall pattern of his test scores indicates a strong suspicion of organic brain dysfunction exists, though this would not likely be demonstrated in areas involving visuospatial function or, for example, construction apraxia. *Further evaluation of the possibility of organic*

The district court ultimately concluded that:

At best, defense counsel presented a disjointed, underdeveloped *social* history which, understandably, did little to cast doubt in the minds of jurors regarding petitioner's mental capacity. Although the record now before this Court shows there was significant information available to counsel which suggested mental incapacity, petitioner's counsel . . . simply failed to pursue or adequately develop the available information.

Opinion Granting Writ at 59.

Initially, the district court criticized the "timeliness" of counsel's investigative efforts. The court faulted defense counsel for waiting until September 30, 1986, "a mere five weeks before trial," to file a motion for funds to hire a psychologist, neurologist, and a pharmacologist. *Id.* at 55. The court noted that on October 10, 1986, counsel moved for leave to transport Petitioner to Columbus for psychological and neurological evaluation by Dr. James Tanley and Dr. DeMaria, between October 18 and 20, 1986, "a mere two weeks before trial." *Id.* The court concluded that the tests were not performed "in any *timely* fashion." *Id.* The court further concluded that the "final outcomes" of the tests were not reported to defense counsel until November 18 and 19, 1986, the day before and the day of the guilty verdicts. Thus, in the district court's view, counsel had no time to effectively respond to these outcomes or plan any effective strategy for dealing with them. *Id.* at 56.

The district court then observed that Dr. Jackson was the only mitigation expert who testified for the defense. The district court noted that Dr. Jackson testified on December 2, 1986, but did not give his report to counsel until November 29, 1986. The court further noted that a preliminary report dated October 19, 1986 was provided to defense counsel, but that the two reports "differ[ed] significantly." *Id.* at 56 n.49. The district court concluded that Dr. Jackson's report was therefore unavailable during *voir dire*, and further found that the expert report reflected "a

very circumscribed role for the expert, namely to *focus* [his examination] upon understanding and explaining [petitioner's] *developmental history and socialization.*" *Id.* Nothing in the report reflects a request by counsel to develop or present evidence of "mental capacity" or of "mental disease or defect." *Id.* The district court continued its criticism by noting that Dr. Jackson's November 29 report stated that he administered psychological tests to Petitioner on October 11, October 12, and November 30. *Id.* at 57. The latter date of course, would have been after the report was issued. *Id.*[9]

The record belies the district court's criticisms. Trial counsel Kenneth Murray testified that mitigation investigation had begun by mid-June 1986. Murray testified that counsel decided to focus primarily on mitigation because of Petitioner's "devastating" confession to the crime on videotape. Murray stated that "[w]e had decided for trial--We did have the strategy at trial, to my recollection, that this was a sentencing case, not a "who done it" type of case." *Id.* He also explained that "we did a lot of criminal investigation and we did a lot of mitigation investigation, but I thought it was more for the sentencing case from the beginning."

Murray testified that trial counsel assembled a "team" to prepare for trial and mitigation presentation. In addition to trial attorneys Murray and Gleespen, the team included David Stebbins, the head of the Public Defenders Death Penalty Unit, Scott Kenney, the senior attorney of the Unit, Jane Core, a mitigation specialist, John O'Connor, the criminal investigator, and two other mitigation specialists, Linda Pudvan and Michael Coconis (hereinafter "Mitigation Team"). Gleespan testified that Murray took the lead on mitigation, because of his experience as an assistant

---

[9] Although the November 29 report indicated that testing was to be done on November 30, it does not appear that any additional testing was performed. The same psychological tests are listed in both the October 19 and November 29 reports. Dr. Jackson's billing statement does not contain an entry for testing on November 30, 1986.

psychologist. Murray has a master's degree in clinical psychology, but is not a licensed psychologist.

The record also undermines the district court's suggestion that trial counsel failed to timely investigate and develop an adequate defense. The record reflects that the mitigation team collected numerous records, which they provided to their experts. Jane Core stated in an affidavit attached to a motion for continuance filed on August 15, 1986, that she had done some initial interviews and requested records from schools and institutions. Counsel had also secured Dr. Jackson at that point. The record shows that over the next three months, the mitigation specialists assembled numerous documents, including records from Petitioner's schools, Department of Youth Services, Juvenile Court, and psychological and medical records. Dr. Jackson's November 29, 1986 report lists the materials the team sent him.[10] The team also interviewed approximately forty witnesses and compiled a witness report, which it supplied to Dr. Jackson.

Dr. Jackson's billing statement reflects that he began working intensely on Petitioner's case on October 9, 1986, by reviewing the documentation sent him by Petitioner's Mitigation Team. He met with the Mitigation Team on October 10, 1986, for three-and-one-half hours, and reviewed

---

[10] Dr. Jackson indicated that he reviewed the following documents: Charles Lorraine's medical reports from St. Joseph's Riverside Hospital,
Charles Lorraine's medical reports from Trumbull County Memorial Hospital,
Charles Lorraine's school records from the Warren City Schools, La Brae Local School, West Branch Local School, and Luther E. Ball High School,
Psychological reports from the Warren City Schools,
Reports from Trumbull County Juvenile Court and the Department of Youth (Wesley Youth Foundation and Cuyahoga Boys School), and a substantial number of statements and interviews of neighbors, relatives, friends, and other people who had knowledge of the history and background of Charles Lorraine and his family.